# In the United States Court of Federal Claims

No. 10-105L
Filed: August 26, 2010

|  |  |  |
|---|---|---|
| WILLIAM CARLO JACHETTA,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>THE UNITED STATES,<br><br>　　　　　Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | 28 U.S.C. § 1500: (i) Where an action filed in this court arises from the same set of operative facts and seeks the same relief as an earlier-filed action in another forum, the earlier-filed action is pending for purposes of section 1500 until its final adjudication on appeal or until the time for appeal has run. (ii) A post-judgment motion under FRCP 60(a) for correction of a clerical error is a pending suit or process within the meaning of section 1500.<br>28 U.S.C. § 2501: (i) The accrual of a cause of action begins with the invasion of a legal right. (ii) An applicant for a Native allotment acquires equitable title to the land and hence a legal right to sue for its invasion when a final administrative adjudication confirms the applicant's qualification and entitlement to award. |

　　Samuel J. Fortier, Fortier & Mikko, P.C., Anchorage, AK, counsel for plaintiff.

　　Dean K. Dunsmore and Steven D. Bryant, with whom was Assistant Attorney General Ignacia S. Moreno, U.S. Department of Justice, Environment & Natural Resources Division, Natural Resources Section, Washington, DC, counsel for defendant.  Joseph D. Darnell, U.S. Department of the Interior, Office of the Solicitor, Anchorage, AK, of counsel.

**OPINION**

WIESE, Judge.

　　Plaintiff, William Carlo Jachetta, sues here to recover damages for injuries allegedly arising from the issuance of permits by the United States Department of the Interior's Bureau of Land Management ("BLM") for the extraction of gravel and

other resources from plaintiff's land.  Defendant has moved to dismiss the complaint for lack of jurisdiction.   The parties have fully briefed the issues and the court heard oral argument on July 21, 2010.  For the reasons set forth below, defendant's motion to dismiss is granted.

BACKGROUND

This case arises under the Alaska Native Allotment Act of 1906, as amended, 43 U.S.C. §§ 270-1 to 270-3 (1970) ("ANAA" or "the Act"),[1] a statute enacted by Congress "to enable individual natives of Alaska to acquire title to the lands they use and occupy and to protect the lands from the encroachment of others." 43 C.F.R. § 2561.0-2 (2010).  The Act authorizes the Secretary of the Interior to grant homestead allotments of up to 160 acres of nonmineral Alaskan land to any Indian, Aleut, or Eskimo of full or mixed blood who resides in and is a native of Alaska, and who is the head of a family, or is 21 years of age.

In order to obtain title to land under the Act, a prospective allottee is required to file an application with the BLM, an action that serves to segregate the land and gives the applicant presumptive priority over all other claimants.  43 C.F.R. § 2561.1. The BLM will not grant an allotment, however, until the agency has surveyed the land and until the applicant has provided satisfactory proof of substantially continuous use and occupancy of the land for a period of at least five years. 43 C.F.R. § 2561.2(a).[2]

Pursuant to this regulatory scheme, plaintiff submitted an allotment application to the BLM on December 10, 1971.  Although the record indicates that plaintiff intended to apply for two parcels—a 50-acre plot located in Tanana, Alaska, and a 110-acre plot located north of Fairbanks, Alaska (now referred to as

---

[1] The ANAA was repealed on December 18, 1971, by section 18 of the Alaska Native Claims Settlement Act, 43 U.S.C. § 1617(a) (1994), with a savings clause preserving allotment applications pending on that date.

[2] 43 C.F.R. § 2561.0-5(a) defines "substantially continuous use and occupancy" as follows:

> The term . . . contemplates the customary seasonality of use and occupancy by the applicant of any land used by him for his livelihood and well-being and that of his family.  Such use and occupancy must be substantial actual possession and use of the land, at least potentially exclusive of others, and not merely intermittent use.

"Parcel B")—plaintiff's application was successfully processed only with respect to the Tanana site. The BLM, in other words, neither approved an application nor issued a certificate of allotment for Parcel B.

Plaintiff did not learn of this omission until 1983. Following his discovery, plaintiff submitted a request to the BLM on May 31, 1983, to amend his original application to include Parcel B. On April 15, 1986, the BLM denied plaintiff's request. Plaintiff appealed the determination to the Interior Board of Land Appeals ("IBLA"). In a decision dated September 13, 1988, the IBLA concluded that a factual issue existed as to whether plaintiff had in fact identified Parcel B as part of his original application and thus referred the matter to an administrative law judge for resolution. William Carlo, Jr., 104 IBLA 277 (1988).

Following an August 1989 hearing, the administrative law judge held that plaintiff had indeed filed a timely application for Parcel B. On appeal, the IBLA upheld that finding and returned the case to the BLM for further processing. Bureau of Land Management v. William Carlo, Jr., 133 IBLA 206 (1995).

On June 5, 1996, the BLM conducted a field examination of Parcel B to determine whether plaintiff had made qualifying use of the land. By letter dated December 28, 2000, the BLM notified plaintiff that his Native allotment application for Parcel B could not be legislatively approved and that his application would therefore require full adjudication.[3] The BLM accordingly requested that plaintiff provide evidence of qualifying use, including "notarized witness statements which clearly support your use and occupancy of the land, stating the date you started using the land and the type of use . . . and any additional information that might support these specific types of use."

Although plaintiff complied with the BLM's request, the BLM ultimately concluded that there was insufficient evidence of qualifying use and occupancy and thus issued a contest complaint on January 28, 2002, challenging plaintiff's application for Parcel B. Following a hearing on this issue, an administrative law judge ruled on March 10, 2003, that plaintiff had "clearly and convincingly demonstrated" that he was entitled to the allotment and thus entered an order approving plaintiff's application for a Native allotment for Parcel B. The BLM accordingly issued an allotment certificate to plaintiff for Parcel B on July 22, 2004.

---

[3] On December 2, 1980, Congress enacted the Alaska National Interest Lands Conservation Act, 43 U.S.C. § 1634(a)(1)(A) (2006), to address the backlog of Native allotment applications then before the BLM by allowing for the legislative approval of certain applications that were pending on or before December 18, 1971. See, e.g., Olympic v. United States, 615 F.Supp. 990, 994 (D. Alaska 1985).

Beginning as early as 1973, however, the BLM had approved a number of land-use applications from various third parties, including the state of Alaska and the Alyeska Pipeline Service Company, to extract gravel and other resources from Parcel B. In an August 30, 2004, report of a trespass investigation commissioned by the Native Village of Tanana, an investigator concluded that the BLM's records, though incomplete, "show that Alyeska has extracted at least $25,750 in minerals since 1986" from Parcel B and that "approximately 700,000 cubic yards of material were removed from the mineral site by Alyeska and the [Alaska Department of Transportation and Public Facilities] during the construction of the Trans-Alaska Pipeline and associated infrastructure." Based on these findings, plaintiff filed an administrative claim with the BLM in March 2005 seeking $2.5 million as compensation for extracted minerals and alleged damage to his property.

The matter was referred to the Department of the Interior's Office of the Solicitor. In an administrative determination dated June 5, 2008, an attorney-advisor for that office denied plaintiff's claim on various grounds, including (i) that plaintiff had failed to demonstrate that the BLM had breached a duty that was actionable under state tort law as is required by the Federal Tort Claims Act, 28 U.S.C. §§ 2671–2680 (the statute under which plaintiff brought his claim); (ii) that no evidence existed that the BLM was negligent in its handling of Parcel B once the agency became aware of plaintiff's claim to the property; and (iii) that plaintiff had suffered no damages because he could not have received an allotment under the law in effect at the time he filed his application and no evidence existed that gravel had been removed from Parcel B since the allotment's certification in 2004.[4]

On May 25, 2004, just over a year after the issuance of the administrative law judge's decision approving plaintiff's allotment application, the BLM rejected or nullified each of the various land-use approvals associated with Parcel B. Specifically, the BLM rejected the state of Alaska's application for the allotment land and further determined that "[s]ince [plaintiff's] use and occupancy predates the material site application, the Alyeska Pipeline Service Company permit . . . is rejected as to the part conflicting with Native allotment application [for] Parcel B." In addition, the BLM concluded that a right of way issued to Yukon Pacific Corporation was null and void as to the land within Parcel B.

---

[4] The decision explained that gravel lands were not available for Native allotments until 1980, when the Alaska National Interest Lands Conservation Act redefined "non-mineral" lands (and thus lands eligible to be allotted under the ANAA) to include land valuable for deposits of sand and gravel. The decision thus concluded that under the law in effect at the time plaintiff filed his December 10, 1971, application, Parcel B was not available for an allotment because it was deemed valuable for gravel.

Plaintiff filed suit in the United States District Court for the District of Alaska on November 26, 2008, against the United States, the BLM, the state of Alaska, and Alyeska Pipeline seeking damages for injuries allegedly arising from Alyeska's removal of rock, sand, and gravel from Parcel B. <u>William Carlo Jachetta v. United States et al.</u>, No. 3:08-CV-00262-RRB. In particular, plaintiff alleged that the BLM had "wrongfully" approved the various land-use applications, thereby violating the United States' fiduciary duty to plaintiff and resulting in a taking of his property under the Fifth Amendment.

On October 15, 2009, the district court entered an order and judgment dismissing plaintiff's claims against the United States and the BLM for lack of subject matter jurisdiction. On November 23, 2009, the court additionally ruled that there was no just reason for delay in the entry of partial judgment under Rule 54(b) of the Federal Rules of Civil Procedure ("FRCP").[5] The court accordingly amended its earlier judgment on January 6, 2010, to read as follows:

> IT IS ORDERED AND ADJUDGED:
>
> THAT plaintiff's claims against the United States of America and BLM are dismissed for lack of jurisdiction and for failure to state a claim upon which relief can be granted.
>
> THAT the court finds there is no just reason for delay of entry of a partial judgment.

On January 19, 2010, plaintiff filed a motion to amend the judgment, asking the court to correct a "clerical error" under FRCP 60(a).[6] While that motion was pending, plaintiff filed suit in this court on February 18, 2010, alleging essentially the same claims asserted in the district court: that the BLM's granting of land-use

---

[5] FRCP 54(b) allows for the entry of a final judgment against one or more, but fewer than all, of the parties in a multi-party lawsuit. Although the district court dismissed the claims against the United States, the BLM, and the state of Alaska, the claims against Alyeska Pipeline remained pending.

[6] In his motion to amend, plaintiff asserted that the judgment incorrectly indicated that the claims against the United States and the BLM had been dismissed both for lack of subject matter jurisdiction and for failure to state a claim upon which relief could be granted. Plaintiff argued, however, that the judge's October 15, 2009, order had dismissed the claims on the first ground only (<u>i.e.</u>, for lack of subject matter jurisdiction). Plaintiff thus sought to have the judgment amended to reflect that fact.

approvals to the state of Alaska and to Alyeska Pipeline constituted a breach of the United States' fiduciary duty to plaintiff and resulted in a Fifth Amendment taking of his property for which compensation is due.[7]

On February 22, 2010, plaintiff filed an appeal with the Ninth Circuit challenging the district court's dismissal of his claims against the United States and the BLM. William Carlo Jachetta v. United States, No. 10-35175. Also on February 22, 2010, the district court granted plaintiff's motion to amend the judgment and accordingly issued a second amended judgment on February 23, 2010, specifying that plaintiff's claims against the United States and the BLM were dismissed for lack of jurisdiction only and not for failure to state a claim as had been earlier indicated. Plaintiff's Ninth Circuit appeal remains pending.

## DISCUSSION

Defendant offers two jurisdictional challenges to plaintiff's complaint. First, defendant argues that this court is prohibited under 28 U.S.C. § 1500 (2006) from exercising jurisdiction over a claim if the same claim is pending against the United States in another forum at the time the complaint is filed here. Defendant thus maintains that we have no jurisdiction over the instant suit because virtually identical claims were pending before the district court when plaintiff's present complaint was filed. Second, and in the alternative, defendant contends that plaintiff's complaint is time-barred because plaintiff's cause of action accrued more than six years before he filed suit here and thus falls outside this court's six-year statute of limitations period identified in 28 U.S.C. § 2501(2006). We address these arguments in turn below.

### A.

28 U.S.C. § 1500, titled "Pendency of claims in other courts," provides as follows:

> The United States Court of Federal Claims shall not have jurisdiction of any claim for or in respect to which the plaintiff or his assignee has pending in any other court any suit or process against the

---

[7] According to the complaint, the United States breached its fiduciary duty to plaintiff by (i) failing to segregate the land contained in Parcel B; (ii) failing to prevent losses to trust funds, including the collection of rent on plaintiff's behalf; and (iii) failing to provide an accounting of payments received in connection with the land since December 10, 1971, the date plaintiff submitted his allotment application to the BLM.

United States or any person who, at the time when the cause of action alleged in such suit or process arose, was, in respect thereto, acting or professing to act, directly or indirectly under the authority of the United States.

As the Federal Circuit observed in UNR Industries, Inc. v. United States, 962 F.2d 1013, 1019 (Fed. Cir. 1992), aff'd sub nom. Keene Corp. v. United States, 508 U.S. 200 (1993), the purpose of section 1500 is to protect the United States from having to defend against the same claim in two different courts at the same time. In determining the applicability of that section, a court must make two inquiries: first, whether the newly filed claims arise from the same set of operative facts and seek the same relief as the earlier-filed claims and second, whether the earlier-filed claims are in fact pending in another forum. Tohono O'Odham Nation v. United States, 559 F.3d 1284, 1287–88 (Fed. Cir. 2009), cert. granted,130 S.Ct. 2097 (2010); Loveladies Harbor, Inc. v. United States, 27 F.3d 1545, 1551 (Fed. Cir. 1994). Here, the first inquiry is easily resolved: in both his district court action and in the instant suit, plaintiff asserts inverse condemnation and breach of trust claims seeking monetary damages from the United States based on the BLM's "wrongful" approval of land-use applications for the purpose of developing and operating a material site. We thus find that these claims are based on the same set of operative facts and seek essentially the same relief—a conclusion plaintiff does not challenge.

The second inquiry, however, proves more complicated. In general, the relevant time period for applying section 1500 is the date the action was filed in this court. Keene Corp., 508 U.S. at 207–09; Harbuck v. United States, 378 F.3d 1324, 1328–29 (Fed. Cir. 2004), rehearing and rehearing en banc denied (Oct. 15, 2004); Mastrolia v. United States, 91 Fed. Cl. 369, 377 (2010). Plaintiff filed his complaint here on February 18, 2010. At that time, the district court had dismissed plaintiff's complaint against the United States and the BLM for lack of subject matter jurisdiction (on October 15, 2009), had found that there was no just reason for delay in the entry of partial judgment (on November 23, 2009), and had entered judgment allowing for immediate appeal (on January 6, 2010). Plaintiff had filed his Rule 60(a) motion with the district court (on January 19, 2010) but had not yet filed an appeal with the Ninth Circuit (he would later do so on February 22, 2010, the same date the district court would grant plaintiff's Rule 60(a) motion). Plaintiff's motion to amend the district court judgment was therefore pending at the time plaintiff filed suit in this court, but his appeal of that judgment to the Ninth Circuit was not.

Defendant argues that a suit remains pending for purposes of section 1500 during the time in which an appeal may be filed. Defendant thus contends that plaintiff's district court action remained pending when plaintiff filed the instant complaint on February 18, 2010, despite the court's prior dismissal of plaintiff's

claims against the United States and the BLM, because the time for filing an appeal had not yet expired. In the alternative, defendant maintains that even if the district court's October 15, 2009, order of dismissal is seen as concluding the suit, plaintiff's Rule 60(a) motion—operating as a motion for reconsideration and requiring resolution by the court—had the effect of reopening the judgment and thus rendering the suit pending once again for purposes of section 1500. Defendant asserts, in other words, that plaintiff's Rule 60(a) motion constituted a "pending process" under section 1500 and thus deprives this court of jurisdiction.

In response, plaintiff points to Young v. United States, 60 Fed. Cl. 418 (2004), for the proposition that a suit is no longer pending for purposes of section 1500 after it has been dismissed by the trial court but before the judgment has been appealed (at which point the suit is once again characterized as pending). Plaintiff maintains that the district court's disposition of his claims against the United States and the BLM under FRCP 54(b) constituted such a dismissal and that his suit was thus no longer pending on the date his action was filed here. Nor, in plaintiff's view, did his filing of a Rule 60(a) motion alter the operation of this rule. Such a motion, plaintiff maintains, is not an attack on the merits of the judgment, but is directed instead at having the judgment correctly reflect what was in fact decided by the trial court and, as such, neither impairs the finality of the judgment nor affects the time for filing a notice of appeal. Plaintiff thus concludes that the judgment dismissing his claims against the United States and the BLM, entered pursuant to FRCP 54(b), remained in place despite the pendency of plaintiff's Rule 60(a) motion and consequently that no suit was pending against the United States and the BLM at the time his action was filed here.

In determining whether a suit or process was pending in the district court following the entry of a final judgment but prior to the resolution of plaintiff's Rule 60(a) motion or the filing of his appeal, we begin with the analysis set forth in Carey v. Saffold, 536 U.S. 214 (2002). In Carey, the Supreme Court was called upon to interpret the word "pending" as that term is used in 28 U.S.C. § 2244(d), a statute governing the timing of federal habeas corpus appeals in relation to the state conviction process. Under that statute, a state prisoner seeking a federal habeas corpus remedy is required to file a federal petition within one year after the state conviction has become final. 28 U.S.C. § 2244(d)(1). The statute provides, however, that the one-year period does not include the time during which an application for state post-conviction or other collateral review is pending in the state court. 28 U.S.C. § 2244(d)(2).

Among the issues presented in Carey was whether the term "pending" includes the time between a lower court's decision and the filing of a notice of appeal in a higher court. The state of California (the appellant in the action) argued that an application for state collateral review is not pending in the state court during the

interval between the lower court's entry of judgment and the timely filing of a notice of appeal (or petition for review) because the petition is not under court consideration during that period. The Court rejected this position, explaining in part as follows:

> California's reading of the word "pending". . . is not consistent with that word's ordinary meaning. The dictionary defines "pending" (when used as an adjective) as "in continuance" or "not yet decided." Webster's Third New International Dictionary 1669 (1993). It similarly defines the term (when used as a preposition) as "through the period of continuance . . . of," "until the . . . completion of." *Ibid.* That definition, applied in the present context, means that an application is pending as long as the ordinary state collateral review process is "in continuance"—*i.e.,* "until the completion of" that process. In other words, until the application has achieved final resolution through the State's post-conviction procedures, by definition it remains "pending."

536 U.S. 219–20.

We think this analysis fits the present case. By commencing a suit in the district court, plaintiff engaged a process that carries with it a right to an appeal. Alaska Packers Ass'n v. Pillsbury, 301 U.S. 174, 177 (1937) (observing that "an appeal in a proper case is matter of right"). So long as that right remains exercisable, the process of which it is a part is properly regarded as pending. To read section 1500 in the narrower sense that plaintiff urges—i.e., to regard a suit as pending only when its merits are under active consideration by a court—is to deny the United States the full protections afforded by the statute by allowing a plaintiff to postpone an appeal until after the filing of the same cause of action in this court. That is, of course, the situation present here. We do not believe, however, that Congress could possibly have intended section 1500's reach to be so easily evaded by a litigant's strategic filing. UNR Industries, 962 F.2d at 1022 (observing that "Congress wanted not to dictate the order in which a claimant files suits in the Claims Court and another court on the same claim, but to discourage him from doing so altogether"). In accordance, then, with the definition of the term "pending" adopted in Carey, we hold that a suit is pending for purposes of section 1500 until its final adjudication on appeal or until the time for appeal has run.[8]

---

[8] We recognize that other courts have reached the opposite result with respect to this issue. In Young, 60 Fed. Cl. at 424–25, for instance, the case on which plaintiff relies, the court concluded that "if a claim filed here had already been dismissed or rejected by another court, it is the actual filing of a notice of appeal of that other court's decision that would make the claim 'pending,' and not the mere
(continued...)

9

Yet, even if the facts of Carey are found to be sufficiently distinguishable to limit the applicability of the Court's analysis therein, we cannot accept plaintiff's construction of section 1500. We see no meaningful distinction between the petition for certiorari that the UNR Industries court identified as a pending suit or process under section 1500, 962 F.2d at 1024, and plaintiff's Rule 60(a) motion. In either case, an application exists for some form of post-judgment relief that names the United States as a defendant and requires a judicial determination for its disposition. Plaintiff's Rule 60(a) motion was therefore a pending process within the meaning of section 1500 and jurisdiction is consequently lacking on that ground.

B.

As an alternative argument, defendant asserts that plaintiff's claims, even if found to survive a section 1500 challenge, are nevertheless time-barred. This court's statute of limitations, set forth at 28 U.S.C. § 2501, provides that "[e]very claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues." The Federal Circuit has held that "a claim 'first accrues' when all the events have occurred which fix the alleged liability of the defendant and entitle the plaintiff to institute an action." Hopland Band of Pomo Indians v. United States, 855 F.2d 1573, 1577 (Fed. Cir. 1988). The parties do not dispute that the events that would give rise to the government's alleged liability—the granting of land-use approvals by the BLM and the initiation of the extraction of minerals from Parcel B—occurred outside the statute of limitations period and that plaintiff was aware of those events, if not from their very start, then certainly no later than mid-1996 when he accompanied the BLM on its field survey of Parcel B. The only issue to be determined, then, is when plaintiff became legally entitled to institute an action to vindicate his claims. See Larson v. Domestic & Foreign Commerce Corp., 337 U.S. 682, 693 (1949) (observing that "[i]t is a prerequisite to the maintenance of any action for . . . relief that the plaintiff claim an invasion of his legal rights").

---

⁸(...continued)
fact that the time to appeal it has yet to run." Although we acknowledge the legitimacy of that interpretation, we believe the decision in Carey counsels in favor of the resolution reached here. See also Wilson v. Clark, 414 So.2d 526, 530 (Fla. Dist. Ct. App. 1982) (observing that "[t]he general rule is that an action remains pending in the trial court until after a final judgment and such time as an appeal is taken or time for an appeal expires. If an appeal is taken, the action is still pending until final disposition.").

10

Defendant identifies several dates on which it contends plaintiff acquired legal rights in the land that would have entitled him to bring suit.[9]  Defendant observes first that plaintiff acquired a preference right in Parcel B at the latest on August 1, 1995, when plaintiff was found by the IBLA to have filed a timely allotment application.  Bureau of Land Management v. William Carlo, Jr., 133 IBLA 206.[10]  Defendant further notes that upon the vesting of this preference right, equitable title is also held by the applicant.  State of Alaska v. 13.90 Acres of Land, 625 F.Supp. 1315, 1320 (D. Alaska 1985), aff'd sub nom. Etalook v. Exxon Pipeline Co., 831 F.2d 1440 (9th Cir. 1987).  Defendant argues, however, that even under the case law upon which plaintiff relies—in particular Anne Lynn Purdy, 122 IBLA 209 (1992)—plaintiff received equitable title no later than April 16, 2003, the effective date of the administrative law judge's order approving plaintiff's allotment application for Parcel B.[11]  It is within six years of this date, defendant maintains, that plaintiff must have filed suit to come within this court's statute of limitations period.

Plaintiff, for his part, acknowledges that the IBLA's August 1, 1995, decision conferred on him a vested preference right in Parcel B, but argues that such a right merely gave him priority over all later-filed applicants for the same parcel and is not legally sufficient to support a cause of action against the United States.  In plaintiff's view, he could not have brought suit on his claims until he acquired either legal or equitable title to the affected land—events that plaintiff maintains did not occur until

---

[9]  The parties draw no distinction between the accrual date for a breach of trust claim and the accrual date for a taking claim.  Although we can envision situations in which the two claims might arise separately—and thus accrue at different points in time—we do not explore that possibility here because we conclude, as discussed below, that both claims are out of time under any interpretation of the facts.

[10]  Because preference rights traditionally vest upon the filing of an application for an allotment and relate back to the beginning of the original period of use and occupancy, State of Alaska v. 13.90 Acres of Land, 625 F.Supp. 1315, 1319 (D. Alaska 1985), aff'd sub nom. Etalook v. Exxon Pipeline Co., 831 F.2d 1440 (9th Cir. 1987), defendant suggests that plaintiff's interests in Parcel B may have arisen much earlier, either upon plaintiff's original pre-1971 occupancy of the land or upon his December 10, 1971, filing of an allotment application.

[11]  Defendant explains that the decision of an administrative law judge, if not appealed, becomes final and effective 30 days after its receipt by the Office of the Regional Solicitor.  Because the March 10, 2003, decision was received by that office on March 17, 2003, and was not the subject of an appeal, the decision became effective 30 days later on April 16, 2003.

the BLM issued his allotment certificate on July 22, 2004. Not until this later date, plaintiff argues, did the statute of limitations begin to run, making his February 18, 2010, complaint timely.

In support of his contention that he did not acquire legal or equitable title to Parcel B until the issuance of his allotment certificate, plaintiff relies primarily on the IBLA's decision in Purdy, 122 IBLA 209. According to plaintiff, the Purdy decision stands for the proposition that equitable title to land vests only when the BLM issues a written decision approving an allotment. Id. at 214. Plaintiff argues that the first and only time the BLM issued a written decision regarding Parcel B was on July 22, 2004, with its issuance of the allotment certificate. The administrative law judge's March 10, 2003, order approving plaintiff's allotment application for Parcel B, effective on April 16, 2003, was not sufficient to confer equitable title, in plaintiff's view, because it was not issued by the BLM.

As further evidence that the administrative law judge's March 10, 2003, order did not vest equitable title, plaintiff points to the May 25, 2004, BLM decision rejecting the various land-use approvals granted to the state of Alaska, Alyeska Pipeline, and Yukon Pacific Corporation. That decision, plaintiff maintains, demonstrates that other land-use approvals were in effect at the time of the 2003 decision, thereby preventing plaintiff's equitable title from vesting any earlier than May 25, 2004 (i.e., upon the termination of such approvals).

Plaintiff is correct that the filing of a timely allotment application does not confer equitable title. 43 C.F.R. § 2561.1 provides in relevant part as follows:

> (e) The filing of an acceptable application for a Native allotment will segregate the lands. Thereafter, subsequent conflicting applications for such lands shall be rejected, except when the conflicting application is made for the conveyance of lands pursuant to any provision of the Alaska Native Claims Settlement Act (43 U.S.C. 1601 et seq.).
>
> (f) By the filing of an application for allotment the applicant acquires no rights except as provided in paragraph (e) of this section. If the applicant does not submit the required proof within six years of the filing of his application in the proper office, his application for allotment will terminate without affecting the rights he gained by virtue of his occupancy of the land or his right to make another application.

We therefore cannot accept defendant's argument that equitable title vested, for the purposes of a statute of limitations analysis, on August 1, 1995. See also Purdy, 122

IBLA at 213 n.12 (finding that "a preference right against conflicting claimants does not equate to establishment of equitable title as against the United States").

It is not the case, however, that plaintiff did not acquire equitable title until July 22, 2004. In Purdy, the IBLA found that equitable title is established when "an entryman has made his final proof, paid the amount of money required, and received a final certificate." Id. at 214. The IBLA went on to observe that "the acceptance of a Native allotment claim has generally been indicated by a written decision of BLM approving the allotment" and concluded that "this is the time when equitable title vests." Id. Contrary to plaintiff's assertion, however, we do not read Purdy as standing for the proposition that the BLM's acceptance of a Native allotment claim—and thus the vesting of equitable title—cannot occur without formal written approval by the BLM. Although the IBLA noted that the acceptance of a Native allotment application has "generally" been indicated by a written decision of the BLM approving the allotment, such language recognizes a common practice rather than a requirement. See, e.g., Webster's II New College Dictionary, 465 (1995) (defining "generally" as "[f]or the most part"; "usually").

Indeed, as defendant notes, the issuance of a written decision by the BLM would not occur where, as here, the agency was contesting an applicant's entitlement to a Native allotment. In such a circumstance, it is the decision of the administrative law judge approving award of a Native allotment and the BLM's subsequent decision not to seek an appeal of that determination that constitutes the agency's acceptance of the Native allotment application and consequently establishes the applicant as a holder of equitable title.

Consistent then with Purdy, we believe that plaintiff obtained equitable title to Parcel B on April 16, 2003, the effective date of the administrative law judge's decision approving plaintiff's allotment application for Parcel B. As the Supreme Court explained in Benson Mining & Smelting Co. v. Alta Mining & Smelting Co., 145 U.S. 428, 433 (1892), "a party who has complied with all the terms and conditions which entitle him to a patent for a particular tract or public land, acquires a vested interest therein, and is to be regarded as the equitable owner thereof." The April 16, 2003, decision issued in plaintiff's favor confirmed that plaintiff, like the grantee in Benson, had satisfied all the terms and conditions for issuance of a patent for a particular tract of land. See also Wirth v. Branson, 98 U.S. 118, 121 (1878) (describing as "well settled" the rule that "when public lands have been surveyed and placed in the market, or otherwise opened to private acquisition, a person who complies with all the requisites necessary to entitle him to a patent in a particular lot or tract is to be regarded as the equitable owner thereof, and the land is no longer open to location"). At that point, nothing remained to be adjudicated or decided; the subsequent issuance of an allotment certificate was administrative in nature only and

provided plaintiff no additional rights beyond those established by the administrative law judge's decision.

Nor are we persuaded by plaintiff's argument that he could not have obtained equitable title to Parcel B any earlier than May 25, 2004, when the BLM rejected or nullified the land-use approvals granted to the state of Alaska, Alyeska Pipeline, and Yukon Pacific Corporation. Such competing interests in the land could not survive as valid rights since they did not arise until after the initiation of plaintiff's use and occupancy of the land. Plaintiff's ownership of the allotment relates back to the initiation of that occupancy; hence, it is an ownership free of any claim of later-created interests in the land. Alaska v. Babbitt, 38 F.3d 1068, 1075 (9th Cir. 1994). Plaintiff's claims must be regarded, then, as having accrued, at the latest, as of April 16, 2003. Plaintiff's February 18, 2010, complaint, filed more than six years after that date, is therefore out of time.

## CONCLUSION

For the reasons set forth above, defendant's motion to dismiss for lack of jurisdiction is granted. The Clerk is directed to enter judgment accordingly.

s/John P. Wiese
John P. Wiese
Judge